Filed 9/22/25  P. v. K.F. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B336655 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. YJ40917-031422 |
| K.F., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, J. Christopher Smith, Judge.  Affirmed.

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Deepti Vaadyala, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

K.F. appeals the juvenile court's order committing him to a secure youth treatment facility ("Facility") and choosing the

maximum possible term and maximum baseline term of confinement under section 875 of the Welfare and Institutions Code and Rule 5.806 of the Rules of Court. We affirm. Unspecified statutory citations refer to the Welfare and Institutions Code and rule references are to the Rules of Court.

## I

Using a gun, K.F. tried to rob Luis Calles-Martinez, but Calles-Martinez fought back. K.F. shot him to death, but in the struggle also shot his own hand.

On March 10, 2022, at around 7:24 p.m., Los Angeles Police Department Officers Ethan Vernon and Jaime Corona got a call about a shooting. They drove to a shopping center on the intersection of Vermont and Slauson Avenues. There, they found Calles-Martinez, moaning in pain, in a parked Camry. Calles-Martinez said he was at the shopping center to buy a birthday present for his son. When getting into his car, he noticed a person whom he described as wearing a black hoodie sweatshirt and surgical mask. When Calles-Martinez got out of his car, the person in the black sweatshirt shot him. Calles-Martinez died in the hospital.

Video footage showed a person matching the description Calles-Martinez provided to the officers. This person was K.F., then fifteen years old. Calles-Martinez walked to his car and K.F. approached. Calles-Martinez sat in his driver's seat. K.F. appeared to start a conversation with Calles-Martinez, who got out of his car. Then K.F. shot Calles-Martinez in the chest. Calles-Martinez got back in his car, sat for a few seconds, and K.F. advanced with an outstretched gun. Calles-Martinez got out and tried to grab K.F.'s gun, swinging his arms as he lunged

forward.  K.F. pistol-whipped Calles-Martinez and shot him again.  The whole interaction was about ninety seconds.

Corona broadcast a description of the suspect at around 8:00 p.m.  About twenty minutes later, Officer Edward Gonzalez called to say someone matched the description.  Gonzalez sent Corona a photograph of a young man.  The picture matched the video.

Shortly after Gonzalez and his partner Cesar Arambula had heard Corona's crime broadcast, they got radio orders to report to a place about three and one-half miles away from the shooting scene.  The call was about a shooting.  Gonzalez and Arambula went to the address.  Tia Phillips, K.F.'s mother, answered the door.

Phillips told the officers her son had been shot and asked the officers to call an ambulance.  Her son, K.F., had a gunshot wound on his hand.

K.F. said he had been shot at Slauson and Vermont.  A car pulled up, K.F. claimed, and someone "just started shooting" at him.

After hearing K.F. say he was around Vermont and Slauson, it occurred to Gonzalez that K.F. might have something to do with the recent shooting broadcast.  Gonzalez sent Corona K.F.'s picture, who confirmed K.F. was the suspect.  Police arrested K.F.  A search found a backpack, gun, and mobile phone with location data.  All three items linked K.F. to the shooting.

On March 14, 2022, the prosecutor filed a petition under section 602 charging K.F. with the first-degree murder of Calles-Martinez, in violation of Penal Code section 187(a).  K.F. denied the allegation.

3

The next day, the court ordered the probation department to provide a report that lays out "what services are offered to developmentally disabled youth who get [Facility] commitments," including housing and programs.

The probation department submitted this report on April 6, 2022. The report noted that, based on the evidence, the detectives had "formed the opinion that [K.F.] tricked [Calles-Martinez] into getting out of his car with the intent to rob him. [K.F.] then shot [Calles-Martinez] when he did not comply [with K.F.]'s demands, causing his untimely demise." It further noted the police had identified K.F. as a Rollin 30's Crips gang member. The report recommended the court commit K.F. to the Facility because he "would benefit from a highly structured environment that could provide him with daily routines, mental health services . . . psychological counseling, and educational [services]." A less restrictive placement was not appropriate for K.F. because he had shown "a deliberate disregard for the safety of the community and its residents" and "a lack of concern for human life and compassion."

Later that same month, K.F. moved the court to appoint a mental health expert under Evidence Code section 730 to examine him for competency. In the declaration supporting this motion, K.F.'s attorney averred K.F. had not attended school in many months, was "often confused by [her] explanation of the court process," and "asks questions and makes observations that do not coincide with the gravity of his circumstances."

The court appointed Dr. Emin Gharibian to examine K.F. Gharibian opined K.F. was competent to stand trial.

4

In August 2022, the court appointed Dr. Katy Gaines to conduct a second mental health evaluation of K.F. Gaines spent about eight hours interviewing K.F.

In December 2022, Gaines submitted her report. Gaines opined K.F. "suffers from significant intellectual and cognitive deficits, poor verbal communication skills, and [attention-deficit hyperactivity disorder]" and "emotional and behavioral disturbances as a result of the manner in which he was raised by his parents, including neglect." She posited K.F.'s mental disorders "were a significant factor in the commission of [the] charged offense," noting that "[w]ithout the appropriate treatment for his constellation of mental health problems, [K.F.] was left vulnerable to fend for himself" and could be "exploited by harmful individuals."

Beginning in May 2022, the probation department submitted periodic reports detailing K.F.'s behavior in custody. The negative case notes in K.F.'s reports far outnumbered the positive ones. Probation officers consistently found K.F. to be insubordinate, disruptive, and disrespectful. Nearly every report included at least one instance of K.F. verbally or physically assaulting another inmate or facility staff. Several times, K.F. threw gang signs or announced his Rollin' 30s affiliation. He repeatedly called officers "stupid," "bitch," or "weird ass," and threatened to "fuck [them] up."

In April 2023, staff found contraband in K.F.'s room, including "two metal pieces that could be used to cut something or someone and a shank made from a screw and gloves for the handle."

In May 2023, K.F. disrupted an educational program by slamming the windows while shouting gang-related obscenities.

An officer instructed K.F. to stop disrupting the class, as the other inmates were completing their school assignments. The officer told K.F. that they would document his behavior and let the court know, to which K.F. responded: "Fuck the write up! Fuck my judge cuh! I don't give a fuck about court! They aint doing shit! You a stupid bitch I'll fuck you up!"

Over four days in October 2023, the court held an adjudication hearing on the section 602 petition. Law enforcement personnel testified for the prosecution; K.F. offered no evidence in his defense. The court found there was "overwhelming evidence that [K.F.] is the individual who committed this offense" and that the petition's allegations against K.F. were true beyond a reasonable doubt.

At the disposition hearing, the prosecutor asked the court to send K.F. to a Facility, citing the evidence in the record and arguing K.F.'s act of shooting Calles-Martinez was "a murder that occurred [] because [K.F.] didn't know when to disengage once his plan of robbing someone at gunpoint didn't go as planned."

In response, K.F. asked for an 18-month placement at Dorothy Kirby Center or a 9-month camp commitment. He pointed out his intellectual disabilities and argued he never had the intent to kill Calles-Martinez.

After acknowledging K.F.'s disabilities, the court ordered K.F. to a Facility, which is the most secure juvenile placement. Each California county has at least one.

On the record, the court considered the factors listed in section 875(a)(3) and the reports from the probation department. The court found a less restrictive alternative disposition would be

unsuitable because Dorothy Kirby Center or camp would not be able to meet K.F.'s "extensive" needs.

The court set K.F.'s baseline term of confinement to be seven years, and the maximum term of confinement to be 15 years to life. In doing so, the court noted: "The baseline term of confinement represents the time in custody necessary to meet the developmental and treatment needs of the youth, and to prepare the youth for discharge to a period of probation supervision in the community. And the maximum confinement time [for] an adult with this offense would be 15 years to life in prison."

## II

On appeal, K.F. makes two attacks on the juvenile court's ruling. One is about the sufficiency of the evidence supporting the placement at the Facility. The other is about the court's compliance with the rules pertaining to Facility commitments, which became effective July 1, 2023. (See *In re Tony R.* (2023) 98 Cal.App.5th 395, 415 (*Tony R.*).) Both arguments lack merit.

We review a juvenile court's commitment decision for abuse of discretion. We examine whether the ruling falls outside the bounds of reason. (See *Tony R., supra*, 98 Cal.App.5th at p. 414.) Under this standard, we make all reasonable inferences to support the decision of the juvenile court and do not disturb findings supported by substantial evidence. (*Ibid.*)

## A

K.F.'s first argument relies on *In re Carlos J.* (2018) 22 Cal.App.5th 1 (*Carlos J.*), which clarified the requirements to commit a minor to the Division of Juvenile Facilities (Division). Before the Legislature passed juvenile justice realignment legislation through Senate Bill 823 (2019-2020 Reg. Sess.) (Stats. 2020, ch. 337) in 2020, the Division was "the state's most

7

restrictive placement for its most severe juvenile offenders . . . ”
(See *In re Miguel C.* (2021) 69 Cal.App.5th 899, 902.)  The
juvenile justice realignment bill “does not change section 202,
which recognizes punishment as a potential rehabilitative tool,
[but] the new scheme implicitly places less weight on punishment
by prioritizing treatment and restricting commitment avenues.”
(*Id.* at p. 907.)

Citing *Carlos J.*, K.F. argues there is no substantial
evidence supporting the court’s decision to commit him to a
Facility, especially in light of the rehabilitative goal of the
juvenile justice realignment legislation.  He points out the
evidence in the record is general and lacks the specificity
required under section 875 for a Facility commitment:  “[w]hile
the probation officer stated the [Facility] would provide suitable
education and treatment to [K.F.], the report speaks only in
general terms about the services the [Facility] could provide.”

The probation department’s report stated:  “While under
the care and supervision of the [Facility], [K.F.] will have the
opportunity to participate in education, mental health and
substance abuse services.  In addition, religious, arts and writing
services are available to continually engage [K.F.] while also
maintaining public safety.”

*Carlos J.* is distinguishable.

*Carlos J.* concerned a minor with no significant earlier
criminal record who admitted to committing assault with a
firearm along with a criminal street gang enhancement.  (*Carlos
J.*, *supra*, 22 Cal.App.5th at pp. 4, 7.)  The juvenile court
committed the minor to the Division, citing the seriousness of the
crime, the minor’s gang affiliation, and public safety.  (*Id.* at p. 9.)
The court stated “that the mental and physical condition and

qualifications of this [minor] render it probable that the youth will benefit from the reformatory, discipline or other treatment provided by the [Division]" but made no specific findings about what specific programs at the Division would benefit the minor. (*Ibid.*)

The Court of Appeal reversed, holding that a Division placement "requires some concrete evidence in the record about relevant programs at the [Division]." (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 12.) It further held: "[w]here a minor has particular needs, the probation department should also include *brief* descriptions of the relevant programs to address those needs." (*Ibid.*)

Substantial evidence supports the court's findings.

The court found that a less restrictive placement would not have met K.F.'s rehabilitation needs. Nor would it have protected community safety.

The probation department recommended a Facility commitment for K.F. because he "would benefit from a highly structured environment that could provide him with daily routines, mental health services to include individual, family counseling, psychological counseling, and educational service[s]." It further noted "the community [would] be protected from further criminal activity by [K.F.] while he is committed to the [Facility]."

This evidence suffices. Section 875 "governs the commitment of juvenile wards to the secure youth treatment facilities ... ." (*Tony R.*, *supra*, 98 Cal.App.5th at p. 406.) It instructs that a court may commit a ward to the Facility if "[t]he court has made a finding on the record that a less restrictive, alternative disposition for the ward is unsuitable." (§ 875, subd.

9

(a)(3).)  "In determining this, the court shall consider all relevant and material evidence, including the recommendations of counsel, the probation department, and any other agency or individual designated by the court to advise on the appropriate disposition of the case."  (*Ibid*.)  Furthermore, the court must "additionally make its determination based on all of the following criteria:

(A)  The severity of the offense or offenses for which the ward has been most recently adjudicated, including the ward's role in the offense, the ward's behavior, and harm done to victims.

(B)  The ward's previous delinquent history, including the adequacy and success of previous attempts by the juvenile court to rehabilitate the ward.

(C)  Whether the programming, treatment, and education offered and provided in a secure youth treatment facility is appropriate to meet the treatment and security needs of the ward.

(D)  Whether the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition that is available to the court.

(E)  The ward's age, developmental maturity, mental and emotional health, sexual orientation, gender identity and expression, and any disabilities or special needs affecting the safety or suitability of committing the ward to a term of confinement in a secure youth treatment facility."

(*Ibid*.)

10

This juvenile court complied with the statute's requirements. It considered the probation department's April 2022 report and periodic detention observation reports, noting K.F.'s problematic behavior in custody. And it went through each of the five criteria listed in section 875(a)(3) on the record. In contrast to the vague description of Division services the *Carlos J.* juvenile court provided, the court here specifically found that a less restrictive placement would be insufficient to meet K.F.'s "extensive" needs and that the Facility placement would give K.F. "an individual rehabilitation plan" to help him "get on track and hopefully get the tools [he needs] to progress and mature and become a responsible adult." And here, the probation department's report was more detailed than the one in *Carlos J.*, as it specifically mentioned "a highly structured environment," family, individual, and psychological counseling, and educational services. Substantial evidence supports the court's decision to commit K.F. to the Facility.

B

K.F.'s second contention is that the court abused its discretion in setting the maximum and baseline terms of confinement without explicitly referencing the factors listed in Rule 5.806. He points out that Rule 5.806, titled "Secure youth treatment facility baseline term," provides: "[i]n its selection of the individual baseline term, the court must review and consider each of the criteria listed in paragraphs (1) through (4) . . . The court must state on the record its reasons for selecting a particular term, referencing each of the criteria and any factors the court deemed relevant." These criteria are: (1) the circumstances and gravity of the commitment offense; (2) the youth's prior history in the juvenile justice system; (3) the

11

confinement time considered reasonable and necessary to achieve the rehabilitation of the youth; and (4) the youth's developmental history. (Rule 5.806, subd. (b).)

The juvenile court complied with the legal requirements for its decision on K.F.'s terms of confinement. Rule 5.806, subdivision (b)'s criteria for selecting a baseline term of confinement overlap significantly with section 875, subdivision (a)(3)'s criteria for committing a minor to a Facility. Both sets of criteria ask the court to consider the nature of the minor's offense, the minor's history in the juvenile justice system, and the youth's personal characteristics in light of the juvenile justice realignment legislation's goal of rehabilitation. (See Rule 5.806, subd. (b); § 875, subd. (a)(3).) As discussed above, the juvenile court considered all of these criteria when it decided to commit K.F. to a Facility. It stated its reasons on the record. The court tied its commitment decision to these criteria, noting it had "considered the individual facts and circumstances of the case."

The juvenile court adequately considered Rule 5.806's criteria. Substantial evidence supports its decision, which was not an abuse of discretion. (See *Tony R.*, 98 Cal.App.5th at p. 414.)

## DISPOSITION

We affirm the juvenile court's order.


                                                    WILEY, J.

We concur:



        STRATTON, P. J.              VIRAMONTES, J.


12